HENRY S. ILLICK, ADMINISTRATOR, v. THE FLINT & PERE MARQUETTE RAILROAD COMPANY.

*Negligence—Duty of railroad company to employés—Plan of bridge —Assumption of risks.*

1. In this case, upon a review of the testimony (see opinion), the negligence of the plaintiff's intestate is held by SHERWOOD and CHAMPLIN, JJ., to preclude a recovery, MORSE, J., reserving his opinion; but all concur in holding that the negligence of the defendant is not shown by the evidence.

2. A railroad company cannot be required to remove a bridge which is without fault in its plan or defect in its structure, while in good repair and safe for the passage of trains, simply because some engineer pronounces it not as good and convenient as some other kind.

3. As between it and its employés, it is the duty of a railroad company to provide a reasonably safe track and equipments; but this does not oblige it to make use of the latest improvements, nor to change the structures upon its road so as to conform to the most recent or advanced ideas upon such subjects, nor does "good railroading" require such action.

4. While it is the duty of a railroad company to furnish sufficient and safe material, machinery, and other means by which the work of its employés is to be performed, and to keep the same in good repair, and their contract of hiring implies adequate pro-

vision against negligence on its part in these respects, the employé assumes all of the risks and perils usually incident to his employment, among which are such as it is his duty to take knowledge of by observation.

Error to Wayne. (Jennison, J.) Argued October 26, 1887. Decided January 5, 1888.

Case. Plaintiff brings error. Affirmed. The facts are stated in the opinion.

*F. A. Baker*, for appellant.

*Wisner & Draper* (*H. M. Campbell*, of counsel), for defendant.

SHERWOOD, J. The plaintiff's intestate was a brakeman on the defendant's cars, and, as plaintiff claims, was killed through the negligence of the company in constructing and maintaining an improper and dangerous railroad bridge on the line of its road near Chippewa station, in the county of Osceola.

It is for the killing of young Illick, by reason of such negligence on the part of the defendant, that this suit is brought, and sought to be maintained.

The only wrong counted upon in the plaintiff's declaration is that the defendant was negligent in maintaining an improperly constructed bridge. The only defect claimed in the construction is that the bridge should have been made wider than it was; that ordinary care and good railroading required this; that the bridge was built 13 feet and 4 inches wide between the trusses, which were 10 feet high, whereas it should have been at least 14 feet between them.

The case was tried in the Wayne circuit court by jury, and at the close of the trial the circuit judge instructed the jury that the peril which overtook the plaintiff, and caused his death, "was one of the accidents incident to his employment," and directed a verdict for the defendant.

The plaintiff asks a review of the case in this Court.

The main facts in the case were undisputed. The bridge at Chippewa station was built about nine years ago, and there is no question but that it was well and strongly built, and at the time of the accident was sound and in good repair, and that no accident of the kind had ever occurred there before; that the track of the road was in the center of the bridge; that the car upon which the deceased was injured was a box freight car, and that at the time of the accident he was climbing up the side of the car upon a ladder, for the purpose of setting the brakes, which were worked from the top of the car; that the train was approaching the bridge at the time the conductor signaled for brakes, and that the plaintiff, who was standing upon a platform car next to the box car at the time, immediately sprang for the brakes, caught the round of the ladder on the side and near the end of the box car, and while swinging himself around the corner to go up the ladder, and in his effort to reach the ladder, he threw his body out so far as to come in contact with the bridge as the car reached it, and was struck with such force as to throw him from the ladder to the track, where he was run over and killed.

The testimony also shows that, at the time the brakeman started for the ladder, the conductor of the train stood near him, and as the brakeman grabbed the ladder upon the side of the box car, and was swinging himself around to go up, the conductor made an effort to stop him, and "hallooed to him to look out for the bridge." The brakeman apparently did not hear the conductor, or, if he did, the warning was not heeded.

The ladders on the defendant's box cars are on the side, and near the end of them. The ends are provided with a handle, which the brakeman, on leaving a flat car to go upon a box car, lays hold of, and then, by swinging himself around the corner of the car, is able to reach the ladder with his foot. The ladder consists of iron bars extending out from the side from three to four inches, and upon the roof, when

reached, is a handle to assist the brakeman in ascending and descending.

At the time of the accident the brakeman had been in the employ of the company for about four months, and, when he was injured, he had been braking for the defendant over 100 days, passing over the bridge twice a day during that time.

The bridge is about 35 rods east of the station, and in sight from the same.

Benjamin Douglas, a bridge engineer, and an expert in the business, was sworn and examined on the part of the plaintiff, and testified that he had been employed in the Detroit Bridge & Iron Works; that he is now in the employ of the Michigan Central Railroad Company, in the chief engineer's office, and is engaged in getting up plans and specifications, and examining plans; that the standard width of railroad bridges which have trusses at the side is, at the present time, on the Michigan Central, fourteen feet in the clear between the trusses; that—

"Fourteen feet is almost universal. You will find narrower bridges. A great many roads have narrower bridges, —a few narrower ones; but they are the older bridges."

That the Michigan Central has three narrower than fourteen feet, but he does not know of any built narrower in the present state of the art; that his knowledge of the standard width of bridges in Michigan has been acquired within the last four years, and he cannot say what the width was of the Howe truss railroad bridge in Michigan five or seven years ago.

That there are seven bridges crossing the Michigan Central between Detroit and Grand Trunk Junction, five of which have been built five years, and five of which are supported by posts, and two not; that the narrowest one between the posts is 12 feet, and another 12 feet 4 inches.

Mr. Wolhaupter, who was in the engineering department of the Detroit, Grand Haven & Milwaukee Railroad, testi-

fied that he had been in the employment of that company over seven years, and that they make the truss bridges on that road about fourteen and a half feet wide, but that there are bridges on the road narrower than that; that the one at Greenville is but thirteen feet and ten inches at the end.

Mr. Colburn, who is secretary and treasurer of the Detroit Bridge & Iron Works, and has been connected with the company since 1883, testified that the usual width of iron bridges in the clear, to-day, is fourteen feet or more, and that, where there is a truss on each side of the bridge,—

"Railroad companies fix their own dimensions in their specifications upon bridges that we are called upon to build."

He further testified:

"I don't know anything about the wood structures; we never built them. * * * We deal altogether in iron and combination bridges."

It further appeared that young Illick was 28 years of age when he was killed, and was temperate, intelligent, and prompt in the performance of all his duties; and the conductor who saw him when he struck the bridge testified that, in the position the brakeman placed himself at the time he struck the bridge, he would have hit it if it had been 16 feet wide.

The foregoing contains substantially all the facts in the case, except the testimony relating to damages, and they are undisputed.

I think the circuit judge was correct in the direction he gave to the jury.

The space between the side of the bridge and the ladder upon the car where the brakeman was injured, as shown by the record, was two feet and three inches wide. The danger in going up the ladder at that place was before him, and was as plain to his observation as to any person connected with the train, or whose duty it was to run upon the road. It was not his duty, on the signal for brakes, to go up the ladder

when the service was fraught with such danger. There was no special request from any person in charge of or controlling the train for him to make the perilous ascent; and, when he did so, it was at his own peril.

The duties of his employment did not require him to go upon the box car until he had passed the bridge. It did, however, require him to observe and take knowledge of the danger, if any, in crossing the bridge, if such knowledge could be obtained by his own observation. He had crossed the bridge 200 times before he was injured; and each time he crossed furnished him an opportunity of observing the very danger which overtook him and caused his death.

The bridge was sound, and safe for the passage of trains, without defect, and in good repair. Whether it was 14 or 24 feet wide was a matter of no concern to the brakeman, so long as he was not required to occupy a place of danger in the discharge of his duties while passing over it, and this he was not required to do.

A railroad company cannot be required to condemn and remove a bridge which is without fault in its plan or defect in its structure, while it is in good repair, and safe for the passage of trains, simply because some engineer shall pronounce it not as good or convenient as some other kind. Railroad companies must be allowed to use their own discretion as to the kind of bridges they will use, and when and under what circumstances they will remove or replace them, while they are safe. Any other rule would be both unjust and oppressive.

As between the employers and employed, it is unquestionably the duty of a railroad company to provide a track and equipments which shall be reasonably safe; but this does not oblige the company to make use of the latest improvements, or to change the structures upon its road so as to conform to the most recent or advanced improvements and ideas upon such subjects; neither does good railroading require any such

thing. Cooley, Torts, 551, 552; *Wonder v. Railroad Co.,* 32 Md. 411; *Coombs v. Cordage Co.,* 102 Mass. 572; *Railroad Co. v. Gildersleeve,* 33 Mich. 133; *McGinnis v. Bridge Co.,* 49 Id. 466; *Batterson v. Railway Co.,* Id. 184; *Railroad Co. v. Huntley,* 38 Id. 537; *Smith v. Potter,* 46 Id. 258, 264; *Hathaway v. Railroad Co.,* 51 Id. 253, 262; *Hewitt v. Railroad Co.,* 67 Id. 61.

While it is the duty of the company to furnish sufficient and safe material, machinery, and other means by which the work of the employed is to be performed, and keep the same in order and repair, and his contract implies that, in regard to these matters, the employer will make adequate provision against negligence on the part of the company, and that no danger shall ensue to him therefrom, it is well settled that the employed assumes all the risks and perils usually incident to the employment, and that included in such risks and perils are those which it is a part of the duty of the employed to take knowledge of by observation. 2 Thomp. Neg. 983; Cooley, Torts, 551; *Railroad Co. v. Austin,* 40 Mich. 247; *Swoboda v. Ward,* Id. 420; *Henry v. Railway Co.,* 49 Id. 498; *Batterson v. Railway Co.,* 53 Id. 128; *Brewer v. Railway Co.,* 56 Id. 620; *Hewitt v. Railroad Co.,* 67 Id. 61; *Davis v. Railroad Co.,* 20 Id. 126; *Gardner v. Railroad Co.,* 58 Id. 584; *Gibson v. Railway Co.,* 63 N. Y. 449; *Owen v. Railroad Co.,* 1 Lans. 108; *Ladd v. Railroad Co.,* 119 Mass. 412; *Lovejoy v. Railroad Co.,* 125 Id. 79.

The conductor of the train, in his testimony, in speaking of young Illick, says:

"The rear end of the train which we had that night would have stopped about twenty car-lengths west—between eighteen and twenty car-lengths west—of the bridge. During his connection with that train, Mr. Illick had occasion to do more or less switching at Chippewa station. Coming east, he was middle brakeman. We carried three brakemen. He had to be switchman at that bridge. Sometimes he would do one part, and sometimes another. Sometimes he would pull the pin, and sometimes would give the signals, and sometimes do

the switching; and in doing that work he could not help but see the bridge. He should have known where the bridge was; he had been there times enough. I had never had any particular talk with him about the danger of swinging out when passing through the bridge,—that is, regarding that particular bridge; but I had cautioned him, when he first commenced braking with me, regarding all bridges. I had told him to look out for them, and keep out of the way."

I do not think the record discloses any fault or negligence on the part of the defendant.

It was not only the duty of the brakeman to know of the dangers at this bridge, but it appears from the conductor's testimony that he had previously had warning to be careful, and not to come in contact with any of the bridges on the road.

I think the negligence of the deceased was such, in this case, as to preclude a recovery by his administrator, and the judgment must therefore be affirmed.

CHAMPLIN, J., concurred with SHERWOOD, J.

MORSE, J. I agree with Mr. Justice SHERWOOD that there was no evidence in this case tending to show any negligence on the part of the defendant. As this disposes of the case, I prefer not to express any opinion as to the negligence of plaintiff's intestate.

CAMPBELL, C. J., did not sit.